56 F.3d 750
 Steven S. SCHOLES, as Receiver for Michael S. Douglas, D & S
Trading Group, Ltd., Analytic Trading Systems,
Inc., and Analytic Trading Service,
Inc., Plaintiff-Appellee,
v.
Charles LEHMANN and Lisa Lehmann, Joseph E. Phillips,
African Enterprise, Inc., et al., Defendants-Appellants.
 Nos. 94-2039, 94-2136, 94-2718 and 94-2947.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 17, 1995.
Decided May 18, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied July 12, 1995.
 
 Alan S. Rutkoff (argued), Gary L. Prior, Richard L. Sandler, Mary B. Tribby, and Mark T. Ostrowski, McDermott, Will & Emery, Chicago, IL, for plaintiff-appellee.
 Eugene Crane, Richard D. Grossman, Dannen, Crane, Heyman & Simon, David A. Shaneyfelt, James A. Davids, Bruce J. Van Heukelem, Hoogendoorn, Talbot, Davids & Godfrey, Chicago, IL, Christopher J. Stoll, Leoris & Cohen, Highland Park, IL, Abraham Brustein, Thomas J. Cunningham (argued) and Thomas G. Jaros, Smith, Williams & Lodge, Joel H. Spitz, Timothy C. Klenk (argued), Jerome K. Bowman, Ross & Hardies, Chicago, IL, Kirk R. McCormick, James J. Murphy, Harris, Karstaedt, Jamison & Powers, Colorado Springs, CO, Philip R. King, Tribler & Orpett, Chicago, IL, and Wayne Johnson, Heart Cry Intern., Round Lake Beach, IL, for defendants-appellants.
 Before POSNER, Chief Judge, and MANION and KANNE, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 Michael Douglas masterminded a Ponzi scheme that has given rise to the interesting and important issues of fraudulent-conveyance law which these appeals require us to consider. Here is how the scheme operated (approximately--we shall simplify the facts for the sake of clarity). Douglas created three corporations and caused them in turn to create limited partnerships in which the corporations would be the general partners and would sell limited-partner interests to the investing public. The corporations represented to prospective investors that the limited partnerships would trade commodities and yield the limited partners a return of 10 to 20 percent per month on their investment. Although some trading of commodities was done, most of the money raised from the sale of the limited-partner interests was used simply to pay the promised return. These payments gave the scheme credibility, enabling Douglas to sell additional limited-partner interests. The scheme was launched in 1987 and by the time it crashed in 1989 Douglas's corporations had raised $30 million from the sale of limited-partner interests. Douglas was prosecuted for fraud, pleaded guilty, and is serving a 12-year federal prison sentence.
 
 
 2
 The Securities and Exchange Commission brought this civil suit against Douglas and his three corporations in 1989, charging multiple violations of federal securities laws. The Commission asked the district court to appoint a receiver for Douglas and the corporations. The court obliged, appointing Steven Scholes of the McDermott firm. To date Scholes has recovered $12 million, consisting mainly of property of Michael Douglas that Douglas had bought with money that he had siphoned from the corporations, which in turn had obtained the money from the sale of shares in the limited partnerships. The receiver has distributed the recovered funds to the investors in the Ponzi scheme who lost money, with the result that, thus far, each has recovered 40 percent of his losses.
 
 
 3
 The appeals that we have consolidated for decision arise from the receiver's efforts to recover additional assets from Douglas's ex-wife (Lisa Lehmann) and her husband, from one of the investors in the Ponzi scheme who was lucky enough to make money (Joseph Phillips), and from five religious corporations. The law under which the receiver proceeded is the Illinois law of fraudulent conveyances as it stood in 1989. Ill.Rev.Stat. ch. 59, p 4 (1987). That law was repealed the following year when Illinois adopted the Uniform Fraudulent Transfer Act, 740 ILCS 160, and later we shall consider the possible bearing of the new law on this case. Federal jurisdiction is based on the ancillary jurisdiction of the federal courts, Pope v. Louisville, New Albany & Chicago Ry., 173 U.S. 573, 577, 19 S.Ct. 500, 501, 43 L.Ed. 814 (1899); Tcherepnin v. Franz, 485 F.2d 1251, 1255-56 (7th Cir.1973)--now a part of their statutory "supplemental" jurisdiction, 28 U.S.C. Sec. 1367; David D. Siegel, "Practice Commentary," 28 U.S.C.A. Sec. 1367, pp. 829, 830-31 (1993); Unique Concepts, Inc. v. Manuel, 930 F.2d 573, 574 (7th Cir.1991), which furnishes the jurisdictional basis for one of the three suits because it was filed after December 1, 1990, the effective date of 28 U.S.C. Sec. 1367. The laying of venue for all three suits in the Northern District of Illinois is authorized by 28 U.S.C. Sec. 754, which allows a receiver to sue in the district in which he was appointed to enforce claims anywhere in the country. The district court granted summary judgment for the receiver against all the defendants and entered judgments of $299,000 against the Lehmanns, $377,000 against Phillips, and $509,000 against the religious corporations.
 
 
 4
 The (old) fraudulent-conveyance statute provided that "every gift ... or transfer ... made with the intent to disturb, delay, hinder or defraud creditors or other persons ... shall be void as against such creditors ... and other persons." It is apparent from the wording of the statute, as well as from its purpose, that if a transfer is made for commensurate consideration--if it is "fair" in the sense of being one side of an equal exchange--it is not voidable. For creditors are not disturbed, delayed, hindered, or defrauded if all that happens is the exchange of an existing asset of the debtor for a different asset of equal value. United States v. Kitsos, 770 F.Supp. 1230, 1235 n. 14 (N.D.Ill.1991) (interpreting Illinois law), aff'd without opinion, 968 F.2d 1219 (7th Cir.1992); see also In re Xonics Photochemical, Inc., 841 F.2d 198, 202 (7th Cir.1988); Boston Trading Group, Inc. v. Burnazos, 835 F.2d 1504, 1513-14 (1st Cir.1987). (Compare the "indubitable equivalent" provision of bankruptcy law. 11 U.S.C. Sec. 1129(b)(2)(A)(iii); In re James Wilson Associates, 965 F.2d 160, 172 (7th Cir.1992).) This implies, the defendants argue, that the only transfers reached by the statute are those made without consideration; and they claim that the transfers to them were supported by consideration and therefore that the receiver's suits must fail. We shall get to that, the central issue in these appeals, in a moment, but we must first consider whether receiver Scholes even had standing to bring the suits.
 
 
 5
 The argument that he did not is that he was "really" suing on behalf not of Douglas or Douglas's corporations, the perpetrator and tools of the Ponzi scheme, respectively, but of the investors, the purchasers of limited-partners interests in the corporations; and a receiver does not have standing to sue on behalf of the creditors of the entity in receivership. Like a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, an equity receiver may sue only to redress injuries to the entity in receivership, corresponding to the debtor in bankruptcy and the corporation of which the plaintiffs are shareholders in the derivative suit. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972); Steinberg v. Buczynski, 40 F.3d 890, 892 (7th Cir.1994); Schacht v. Brown, 711 F.2d 1343, 1346 n. 3 (7th Cir.1983); Boston Trading Group, Inc. v. Burnazos, supra, 835 F.2d at 1514-16. How, the defendants ask rhetorically, could the allegedly fraudulent conveyances have hurt Douglas, who engineered them, or the corporations that he had created, that he totally controlled and probably (the record is unclear) owned all the common stock of, and that were merely the instruments through which he operated the Ponzi scheme?
 
 
 6
 The answer--so far as the corporations are concerned, and we need go no further--turns out to be straightforward. The corporations, Douglas's robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties. They received money from unsuspecting, if perhaps greedy and foolish, investors. That money should have been used for the stated purpose of the corporations' sale of interests in the limited partnerships, which was to trade commodities. Instead Douglas caused the corporations to pay out the money they received to himself, his ex-wife, his favorite charities, and an investor, Phillips, whom Douglas wanted to keep happy, no doubt in the hope that Phillips would invest more money in the Ponzi scheme or encourage others to do so. In the case of the ex-wife, the money went from the corporations first to Douglas and then from him to her, but we cannot see what difference that should make. If the money stopped with Douglas, a certain awkwardness might arise from the fact that Scholes is the receiver both for Douglas and for the corporations which would be suing him for that money. But that is not our case and we need not consider it.
 
 
 7
 The three sets of transfers removed assets from the corporations for an unauthorized purpose and by doing so injured the corporations. As sole shareholder, Douglas could lawfully have ratified the diversion of corporate assets to noncorporate purposes--but only if creditors were not harmed. Steinberg v. Buczynski, supra, 40 F.3d at 892; Dannen v. Scafidi, 75 Ill.App.3d 10, 30 Ill.Dec. 899, 903, 393 N.E.2d 1246, 1250 (1979). Creditors were harmed. The limited partners were tort creditors of the corporations from which they had been inveigled into buying limited-partner interests, and were, of course (other than Phillips), harmed. "It was not within the power of the shareholders to legalize this waste to the detriment of others." McCandless v. Furlaud, 296 U.S. 140, 160, 56 S.Ct. 41, 47, 80 L.Ed. 121 (1935) (Cardozo, J.).
 
 
 8
 Though injured by Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud. The rule is that the maker of the fraudulent conveyance and all those in privity with him--which certainly includes the corporations--are bound by it. Getty v. Hunter, 166 Ill.App.3d 453, 116 Ill.Dec. 825, 827, 519 N.E.2d 1040, 1042 (1988); Peric v. Chicago Title & Trust Co., 89 Ill.App.3d 271, 44 Ill.Dec. 568, 411 N.E.2d 934 (1980). But the reason, of course, as the cases just cited make clear, is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys--for the benefit not of Douglas but of innocent investors--that Douglas had made the corporations divert to unauthorized purposes. McCandless v. Furlaud, supra, 296 U.S. at 159-61, 56 S.Ct. at 47; Texas & Pacific Ry. v. Pottorff, 291 U.S. 245, 260-61, 54 S.Ct. 416, 420, 78 L.Ed. 777 (1934); Southmark Corp. v. Cagan, 999 F.2d 216, 222 (7th Cir.1993). That the return would benefit the limited partners is just to say that anything that helps a corporation helps those who have claims against its assets. The important thing is that the limited partners were not complicit in Douglas's fraud; they were its victims.
 
 
 9
 Put differently, the defense of in pari delicto loses its sting when the person who is in pari delicto is eliminated. McCandless v. Furlaud, supra, 296 U.S. at 160, 56 S.Ct. at 47; Albers v. Continental Illinois Bank & Trust Co., 296 Ill.App. 596, 17 N.E.2d 67 (1938). Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas. We cannot see any legal objection and we particularly cannot see any practical objection. The conceivable alternatives to these suits for getting the money back into the pockets of its rightful owners are a series of individual suits by the investors, which, even if successful, would multiply litigation; a class action by the investors--and class actions are clumsy devices; or, most plausibly, an adversary action, in bankruptcy, brought by the trustee in bankruptcy of the corporations if they were forced into bankruptcy. Concerning this last alternative, it is true that investors, including limited partners in a corporation's investment fund, are not contractual creditors of the corporation, Allen v. Amber Manor Apartments Partnership, 95 Ill.App.3d 541, 51 Ill.Dec. 26, 32, 420 N.E.2d 440, 446 (1981); In re Dutch Inn of Orlando, Ltd., 614 F.2d 504 (5th Cir.1980) (per curiam), any more than the corporation's stockholders are. But defrauded investors, as we have pointed out, are tort creditors. So Douglas's corporations were insolvent from the outset and could have been petitioned into bankruptcy. Corporate bankruptcy proceedings are not famous for expedition, however; and whatever advantages they may have over receiverships in a case such as this--if any, and none has been pointed out to us--are not ones that the defendants in these fraudulent conveyance actions should be heard to trumpet. Bankruptcy is for the protection of debtors and creditors, and so far as appears no debtors or creditors connected with Douglas's enterprise prefer the bankruptcy route to the receivership route.
 
 
 10
 We add that if in place of the receiver's actions the investors had brought a class action against the present defendants, or had sued them individually, the defendants would no doubt be arguing that the action was improper because the injury was to the corporations and only derivatively to investors in the corporations. Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 777 (7th Cir.1994); Kagan v. Edison Bros. Stores, 907 F.2d 690 (7th Cir.1990); Manson v. Stacescu, 11 F.3d 1127, 1131 (2d Cir.1993).
 
 
 11
 We need not consider whether if Douglas had operated as a sole proprietorship rather than through corporations or other legally distinct entities, the receiver could still have maintained these suits. It could be argued, RICO-fashion, that the Ponzi scheme was a "Douglas enterprise" that Douglas caused to dissipate assets received by the enterprise for investment purposes. We need not decide how good an argument it is, and merely add that we can find no cases in which a receiver for a sole proprietorship recovered a fraudulent conveyance.
 
 
 12
 So these are proper suits and the next question is whether the transfers should be deemed to fall outside the statute because they were supported by sufficient consideration. Begin with the transfer to Phillips. He invested some $2.5 million in Douglas's scheme, all innocently we may assume, and by exceptional good fortune netted almost $300,000 on his investment. This profit, more precisely the expectation of this profit, was in consideration of Phillips's entrusting his money to Douglas's corporations. Douglas's ex-wife might be able to show that some of the transfers made to her were supported by consideration in the form of a discharge of Douglas's legal obligations to her--obligations of child support and the like arising from their divorce. In the case of the religious associations, which are charitable organizations, it may seem obvious that since charitable pledges are often found or deemed to be supported by consideration and therefore legally enforceable, Allegheny College v. National Chautauqua County Bank, 246 N.Y. 369, 159 N.E. 173 (1927) (Cardozo, J.); King v. Trustees of Boston University, 420 Mass. 52, 647 N.E.2d 1196 (1995); 1 E. Allan Farnsworth, Contracts Sec. 2.19 (1990), so must the actual donation to the charity. There is support for this proposition, Dunaway v. First Presbyterian Church, 103 Ariz. 349, 442 P.2d 93, 95 (1968), but only in the case, which this is not, where the donor is seeking to enforce a condition in his gift. A promise of a gift is a promise nonetheless, and so is a promise to the donor to abide by a condition in the gift; and the enforcement of promises is the office of contract law. The gift itself is not a promise, however; it is a gift. United States v. American Bar Endowment, 477 U.S. 105, 118, 106 S.Ct. 2426, 2433, 91 L.Ed.2d 89 (1986).
 
 
 13
 The statute under which the receiver sued does not say that transfers supported by consideration are outside its reach. It does not have to. A transfer for full in the sense of commensurate consideration cannot (in the ordinary case, anyway) hinder, defraud, or otherwise discomfit creditors, because it is merely replacing one asset with another of equivalent value, as with revolving credit. The point is explicit in the new statute. It states in language virtually identical to the corresponding provision in the Bankruptcy Code, 11 U.S.C. Sec. 548(a)(2), that a transfer will be deemed fraudulent if the debtor made it "without receiving a reasonably equivalent value in exchange for the transfer." 740 ILCS 160/5(a)(2). The transfer must also, under the new statute as under the old, endanger the transferor's solvency. Gary-Wheaton Bank v. Meyer, 130 Ill.App.3d 87, 85 Ill.Dec. 180, 186, 473 N.E.2d 548, 554 (1984); 740 ILCS 160/5(a)(2)(A), (B). But that is not a serious issue here, as we shall see.
 
 
 14
 The requirement of full consideration is implicit in the old statute. Unless the challenged transfer involves a quid pro quo, there is no basis in the statutory language for placing the transfer beyond the statute's reach merely because there is consideration. Consideration and adequate (full, fair, commensurate) consideration are not synonyms. Although some Illinois cases, such as Till v. Till, 87 Ill.App.2d 358, 231 N.E.2d 641, 643 (1967), and Effingham State Bank v. Blades, 139 Ill.App.3d 259, 93 Ill.Dec. 764, 487 N.E.2d 431 (1985), suggest that a transfer not intended to deceive creditors is fraudulent only if the consideration for it is nonexistent or "grossly" inadequate, the state's highest court has said that inadequacy is enough. Gendron v. Chicago & North Western Transportation Co., 139 Ill.2d 422, 151 Ill.Dec. 545, 553, 564 N.E.2d 1207, 1215 (1990). See also United States v. Kitsos, 770 F.Supp. 1230, 1235 n. 14 (N.D.Ill.1991) (interpreting Illinois law); Lewis v. Superior Court, 30 Cal.App.4th 1850, 37 Cal.Rptr.2d 63, 79 (1994); Leonardo v. Leonardo, 251 F.2d 22, 26 (D.C.Cir.1958).
 
 
 15
 We can make the distinction between consideration and full consideration perspicuous by noting that the requirement of consideration serves several purposes in the law of contracts, see Lon Fuller, "Consideration and Form," 41 Colum.L.Rev. 799 (1941), in particular a cautionary function of bringing home to the promisor the fact that his promise is legally enforceable and an evidentiary function, important in a legal regime that enforces oral contracts, of making it more likely that an enforceable promise was intended. One purpose the requirement does not serve, however, is identifying fair exchanges. Unless fraud or mistake is alleged, ordinarily a court will not even permit inquiry into the adequacy of the consideration for a promise or a transfer. E.g., Goodwine State Bank v. Mullins, 253 Ill.App.3d 980, 192 Ill.Dec. 901, 625 N.E.2d 1056, 1079 (1993); Curtis 1000, Inc. v. Suess, 24 F.3d 941, 945 (7th Cir.1994). Yet it is only when there is a fair exchange that a transfer which renders the transferor insolvent (or more insolvent) is harmless to his creditors.
 
 
 16
 What exactly is a fair exchange? Must the transferor at least break even on the exchange? Ordinarily he will do better than break even. No rational nonaltruist makes an exchange without thinking that it will make him better off; the phrase "the gains from trade" expresses the optimistic view that the normal voluntary exchange makes both parties better off. But this is not always true, especially in a setting of alleged fraud, where the defendant may have deliberately given more than he got in return.
 
 
 17
 To insist that the transferor be made no worse off by the exchange in order to avoid a finding of fraudulent conveyance could be criticized as doing violence to the structure of the statute. As was implicit in the old statute and is explicit in the new one, the statute reaches two kinds of fraud, traditionally called "fraud in fact" and "fraud in law" (sometimes "actual fraud" and "constructive fraud"). We have been discussing the second, in which the plaintiff is not required to prove fraudulent intent. If he does prove fraudulent intent, however, and thus "fraud in fact," then explicitly under the new statute as implicitly under the old the transfer is deemed fraudulent even if it is in exchange for "valuable" consideration. 740 ILCS 160/5(a)(1); Gendron v. Chicago & North Western Transportation Co., supra, 564 N.E.2d at 1214-15. There almost certainly was intent to defraud here on the part of Douglas and through him the corporations, but it is not the basis on which the receiver defends the judgment he obtained in the district court, except with regard to the transfers to the ex-wife, of which more later. If valuable consideration means full consideration, then even if there is intent to defraud there can be no harm to creditors, since the debtor's estate has not been depleted by a cent. So why is there a separate concept of fraud in fact? Why is not fraud in law both a necessary and a sufficient condition for finding a transfer fraudulent?
 
 
 18
 There are two answers. The first is evidentiary. If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly. If the plaintiff takes the indirect route of proving fraud by proving a lack of full consideration, the burden of proof on the issue of incommensurability of consideration, and hence of the depletion of the debtor's assets, is on him. Cf. id. at 1215. Second, if fraudulent intent is proved, then, as we shall see, the defendant, unless he had no knowledge of the transferor's fraudulent intent, must return the entire payment that he received rather than just the amount by which it exceeded the consideration that he gave in exchange for the payment.
 
 
 19
 We shall come back to fraud in fact. Our present focus is on fraud in law. And here unless a fair in the sense of equal (or at least approximately equal) exchange is insisted upon, loopholes are opened in the fraudulent conveyance statute that can only be described as immoral--a relevant consideration, when we consider the equitable origins of the concept of fraud. We said that Phillips's profit was supported by consideration. But what was the source of the profit? A theft by Douglas from other investors. What then is Phillips's moral claim to keep his profit? None, even if the intent in paying him his profit was not fraudulent. Or less than none. For he argues (seemingly without realizing the implications of the argument) that by continuing to invest in Douglas's corporations he kept them going longer. Yes, and the longer a Ponzi scheme is kept going the greater the losses to the investors. Phillips was not only lucky; he was an unwitting accomplice of Douglas.
 
 
 20
 The injustice in allowing Phillips to retain his profit at the expense of the defrauded investors is avoided by insisting on commensurability of consideration. Phillips is entitled to his profit only if the payment of that profit to him, which reduced the net assets of the estate now administered by the receiver, was offset by an equivalent benefit to the estate. In re Independent Clearing House Co., 77 B.R. 843, 857-59 (D.Utah 1987). It was not. A profit is not offset by anything; it is the residuum of income that remains when costs are netted against revenues. The paying out of profits to Phillips not offset by further investments by him conferred no benefit on the corporations but merely depleted their resources faster.
 
 
 21
 It is no answer that some or for that matter all of Phillips's profit may have come from "legitimate" trades made by the corporations. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations. Phillips was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money. That would be true as between him and Douglas or Douglas's corporations. It is not true as between him and either the creditors of or the other investors in the corporations. He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment--the difference between what he put in at the beginning and what he had at the end.
 
 
 22
 Douglas's ex-wife, to whose case we turn, may well have had some valid claims against her ex-husband. She had no entitlement to have those claims paid by the proceeds of fraud, as would be obvious if Douglas had picked someone's pocket and given the money found there to his ex-wife. But if she had had valid claims against Douglas equal to the amount of money he gave her, so that by giving it to her he received consideration in the form of a release of commensurate legal obligations to her, this would be adequate and not merely nominal consideration. There would be no net depletion of the estate administered by the receiver, which is the standard of adequacy as we have been articulating it.
 
 
 23
 The obvious objection to this reasoning is that the ex-wife's claims were claims against Douglas rather than against his corporations, and therefore the release of the claims did not benefit the corporations; they received no consideration for the money they paid out to her (via Douglas). The receiver makes nothing of this distinction, fundamental as it may seem to be. There probably are two reasons for this omission. The first is that the ex-wife's liability--she is a defendant, after all--depends in the first instance on what she gave up in exchange for the money she received rather than to whom that consideration (what she gave up) flowed. Second, the corporations may have been so far controlled by Douglas as to be his alter egos, and therefore (in the absence of other shareholders--an important qualification, elaborated below) liable for his debts. McCall Stock Farms, Inc. v. United States, 14 F.3d 1562, 1568-69 (Fed.Cir.1993); Zahra Spiritual Trust v. United States, 910 F.2d 240, 245 (5th Cir.1990). Lest the significance of this point be exaggerated, we add that the fact that the corporations were alter egos of Douglas would not affect the receiver's standing to bring these fraudulent conveyance suits. The corporations existed and were abused. They were so abused that Douglas's creditors might have been allowed to pierce the corporate veil and seize the corporations' assets pursuant to what is uncharmingly called the "reverse alter ego" theory of piercing the corporate veil. Direct piercing of the corporate veil occurs when creditors of the corporation are trying to reach the shareholder; reverse piercing occurs when creditors of the shareholder are trying to reach the corporation. Reverse piercing is ordinarily possible only in one-man corporations, since if there is more than one shareholder the seizing of the corporation's assets to pay a shareholder's debts would be a wrong to the other shareholders. Even in one-man corporations it is a rarity because a simple transfer of the indebted shareholder's stock to his creditors will usually give them all they could get from seizing the assets directly. But the only point that is important here is that reverse piercing of Douglas's corporate veils would not render the corporations incapable of being injured, and that is all that is necessary for these suits to be maintained by the receiver. The question is whether, because the corporations were Douglas's alter egos, they could be made liable for his debts, and we assume the answer is yes.
 
 
 24
 The objections to the ex-wife's claims lie elsewhere. One objection is the lack of evidence that they were worth what the corporations paid to discharge them. For obvious reasons, judges are particularly insistent upon proof of commensurability when they are dealing with intrafamilial transfers attacked as fraudulent conveyances. Kardynalski v. Fisher, 135 Ill.App.3d 643, 90 Ill.Dec. 410, 415, 482 N.E.2d 117, 122 (1985); United States ex rel. Hartigan v. Alaska, 661 F.Supp. 727, 729 (N.D.Ill.1987). Douglas's transfers to his ex-wife were lavish, and the principal "obligation" that they are claimed to have discharged was one created by a voluntary settlement that received no judicial scrutiny. Given the scale of the transfers and the family setting, it was the ex-wife's burden to prove that the consideration for the transfers she received was in fact adequate, commensurate. She failed to carry this burden.
 
 
 25
 There is a difference, though, between her situation and that of Phillips (and also, as we shall see, of the religious associations). Phillips is being asked to give back to the corporations the net amount by which the corporations' assets are smaller as a result of the payment to him of his profits. The ex-wife is being asked to give back all that she received from the corporations even if some of the receipts cancelled a debt that the corporations (as Douglas's alter egos, liable for his debts) owed her. Suppose the valid debt was $100, and she received $1,000; the receiver would be entitled only to $900, for the payment to her of the other $100 conferred a benefit equal to the cost by cancelling the debt of that amount. Snyder v. Partridge, 138 Ill. 173, 29 N.E. 851, 854 (1891); Reagan v. Baird, 140 Ill.App.3d 58, 94 Ill.Dec. 151, 157, 487 N.E.2d 1028, 1034 (1985). Given the legal obligation of child support in divorce cases, it is unlikely that the ex-wife had no valid claims at all. She was denied an opportunity to prove the amount of those claims. It is plain that the aggregate transfers made to her exceeded any plausible legal obligation that Douglas or the corporations could have had to her--and hence that the transfers were fraudulent--but we do not know by exactly how much.
 
 
 26
 This discussion shows that the district judge acted prematurely in granting summary judgment for the receiver against the ex-wife on a theory of "fraud in law" to the full extent of the money received by her. But the receiver, in his second objection to her claim, argues that we can affirm the district court on this point because there was "fraud in fact" as well as in law: Douglas caused the corporations to pay the ex-wife more than he owed her, in a deliberate effort, in which she was complicit, to defraud his and the corporations' other creditors. The evidence, though circumstantial, is strong, cf. Wilkey v. Wax, 82 Ill.App.2d 67, 225 N.E.2d 813, 816-17 (1967), but we do not think it is so strong that we can say as a matter of law that there was fraud in fact. Should the district court on remand find actual fraud, this would mean that the ex-wife is not entitled to keep any part of the money she received from the corporations--provided, we emphasize, that she knew or should have known of Douglas's fraudulent intent. Crawford County State Bank v. Marine American National Bank, 199 Ill.App.3d 236, 145 Ill. Dec. 224, 238-39, 556 N.E.2d 842, 856-57 (1990); Reagan v. Baird, supra, 487 N.E.2d at 1034; Second National Bank v. Jones, 309 Ill.App. 358, 33 N.E.2d 732, 736 (1941) (per curiam); Baldwin v. Short, 26 N.E. 928 (N.Y.1891); Peoples-Pittsburgh Trust Co. v. Holy Family Polish National Catholic Church, 341 Pa. 390, 19 A.2d 360 (1941); 740 ILCS 160/9(d). Inadequacy of consideration is not an element of fraud in fact, so that without full restitution the deterrent effect of the fraudulent conveyance law would be greatly weakened. We add that the ex-wife's claims against Douglas, to the extent supported by consideration, would not be extinguished by a finding of actual fraud (and her complicity); they would simply be thrown into the pool with the claims of the other creditors of the corporations, the assets of which would be augmented by the judgment against her. But she would lose the right to keep any part of the money she received out of the pool.
 
 
 27
 The suits against the religious corporations are the most troublesome, though not because of anything to do with consideration. If one thing is clear, it is that a gift to a charity (to anyone, for that matter) is not in exchange for full in the sense of commensurate consideration. Otherwise it would not be a gift, but an exchange. United States v. American Bar Endowment, supra, 477 U.S. at 118, 106 S.Ct. at 2433. This principle was applied to a conveyance challenged as fraudulent in Zahra Spiritual Trust v. United States, supra, 910 F.2d at 248-49.
 
 
 28
 A thief rushes into a church, and, unobserved by anyone, drops the money he has stolen from his victim into the collection plate. Does the church obtain good title as against the thief's victim? It does not. The case is only slightly more difficult if the "thief" obtained the money by fraud rather than by larceny. A theft cannot pass good title; most frauds can. E.g., Welch v. Cayton, 183 W.Va. 252, 395 S.E.2d 496 (1990). The fraudulent conveyance statute, however, would enable the owner to set aside the transfer to the church and recover the money. We do not think that anyone would quarrel with this result. What if, however, the owner does not discover his loss, or where his money has ended up, until the church has spent the money? Shall the church be forced to divert funds from its religious and other charitable activities because a donation that it received in good faith had a tainted source?
 
 
 29
 One of the religious corporations argues that an affirmative answer would violate the free-exercise clause of the First Amendment, made applicable to the states by the Fourteenth Amendment. The receiver responds that the constitutional issue, not having been raised in the district court, has been waived. The religious corporation points out that there are exceptions to the rule that issues not raised in the district court are waived on appeal. The only one conceivably applicable here is that pure issues of law if fully briefed on appeal will sometimes be addressed by the appellate court notwithstanding the appellant's failure to have raised them below. Amcast Industrial Corp. v. Detrex Corp., 2 F.3d 746, 749-50 (7th Cir.1993). The reason is that in the type of case put the failure to have raised the issue in the lower court will not have prejudiced the opposing party or shifted decisional authority improperly from the trial to the appellate court, since appellate review of pure issues of law is plenary--no weight is given to the lower court's ruling. But a case in which the issue waived is the constitutionality of a statute will rarely be a good candidate for actually applying this exception to the doctrine of waiver. Federal courts should not go out of their way to hamstring the work of legislatures. No doubt in general this principle of deference has diminished force when the challenged legislation has been repealed. But the Illinois fraudulent conveyance law that the religious corporation is challenging, although since repealed, has been replaced by one materially the same, as we have seen. The corporation argues that the old statute is unconstitutional because it has no exception for donations to religion. The argument would apply equally to the new statute, which contains no such exception either.
 
 
 30
 Federal courts are, or at least ought to be, especially reluctant to invalidate statutes on constitutional grounds by the use of procedural shortcuts, which in this case would involve not only skipping the district court but also denying the Attorney General of Illinois his statutory right to defend the Illinois statute. A district court is required in the case of a challenge to the constitutionality of a state or federal statute to certify the challenge to the state or federal attorney general, respectively, and allow that official an opportunity to intervene and defend the statute. 28 U.S.C. Sec. 2403; Max M. v. New Trier High School District No. 203, 859 F.2d 1297, 1300 (7th Cir.1988). That was not done here, because the constitutional issue was not raised in the district court. We shall not consider it.
 
 
 31
 The other religious bodies that are defendants in the receiver's fraudulent conveyance suits do not make a constitutional argument. But they do argue that the fraudulent conveyance statute should be interpreted to exclude gifts to religious groups and other charitable organizations, at least when as in this case the ultimate beneficiaries of the fraudulent conveyance suits, the investors in Douglas's Ponzi scheme, are themselves at fault. Only a very foolish, very naive, very greedy, or very Machiavellian investor would jump at a chance to obtain a return on his passive investment of 10 to 20 percent a month (the Machiavellian being the one who plans to get out early, pocketing his winnings, before the Ponzi scheme collapses). It should be obvious that such returns are not available to passive investors in any known market, save from the operation of luck. And on the other side, these religious corporations spent all the money they received from Douglas on religious and charitable activities. Most of the activities of the defendant religious corporations are missionary endeavors here and abroad, but included as well are earthquake relief in San Francisco and the construction of a chicken hatchery and a children's dormitory in Africa. Since all or virtually all of the corporations' revenues come from donations rather than from sales or other exchanges, they are more exposed to fraudulent conveyance actions than most other entities are; others are more likely to provide full consideration in exchange for the money they receive. At the oral argument of the appeals, concern was expressed, not wholly tongue in cheek, that if the district court's decision stands, charities will have to hold annual "fraud balls" at which they try to raise money to pay judgments in suits brought by persons who claim that some of the money donated to the charity had been obtained from these persons by a fraud or theft by the donor.
 
 
 32
 An alternative to "fraud balls" would be for charities to screen their donors, but this hardly seems feasible. Another alternative, feasible but costly, would be for charities to hold cash reserves against the possibility of having to disgorge some of their donations in response to claims of fraudulent conveyance. Liability insurance is a possibility, too, but only that. Although one cannot buy insurance against liability for deliberate fraud, the innocent recipient of a fraudulent conveyance is not itself guilty of fraud and so in principle ought to be able to buy insurance. It appears that such insurance is offered, though with limitations that may greatly reduce its value, and perhaps only for conveyances of real estate. See Lawrence D. Coppel & Lewis A. Kann, "Defanging Durrett; The Established Law of 'Transfer,' " 100 Banking L.J. 676, 677 n. 5 (1983). We do not know whether any religious groups carry such insurance. If not (as we suspect), the reason may be that the risk to such a group of being sued for the restitution of a fraudulent conveyance is very small, although it did materialize in this case.
 
 
 33
 The arguments for mitigating the full rigor of the fraudulent conveyance statute with respect to religious associations may be appealing but they are addressed to the wrong body. The statute makes no distinction among different kinds of recipient of fraudulent conveyances. Every kind is potentially liable. (This is true under the new statute as well.) The carving of exceptions is a task better left to the legislature. Statutory draftsmen might for example want to make distinctions based on the degree of negligence of the ultimate beneficiaries of the suit to set aside the fraudulent conveyance. They can do it better than a court can. They could of course authorize courts to engage in an ad hoc balancing of equities, as courts do for example in deciding whether a claim is barred by the equitable defense of laches; and perhaps in this case the balance would incline in favor of the charities. But nothing in the text or history of the Illinois statute or its counterparts in other states provides any purchase for this "interpretation," which would in fact be a radical rewriting of the statute. This is something that judges are understandably reluctant to do, especially when it is a state statute and federal judges.
 
 
 34
 The religious corporations have a more direct route to their goal. For they argue that the statute does not authorize a money judgment, but only an order--with which they could not comply, having spent the money--directing the rescission of the transfer. The argument is not persuasive. E.g., Tcherepnin v. Franz, 489 F.Supp. 43, 45 (N.D.Ill.1980) (interpreting Illinois law); Spaziano v. Spaziano, 122 R.I. 518, 410 A.2d 113, 115 (1980). If accepted it would cause recipients (not limited to charities) of gifts and other transfers potentially voidable under the fraudulent conveyance statute to spend the money immediately, in an effort (perhaps doomed anyway, cf. United States v. Ginsburg, 773 F.2d 798 (7th Cir.1985) (en banc)) to prevent tracing. The result would be the frustration of the statutory purpose.
 
 
 35
 The remaining issues mainly concern deficiencies in the record upon which the district judge based his conclusion that there was no genuine issue of material fact concerning the defendants' liability. To show that the transfers to the defendants were fraudulent within the meaning of the statute, the receiver had to show that, when each of the transfers was made, Douglas's corporations had creditors to hinder, defraud, and so forth and that the transfers jeopardized the corporations' solvency. The receiver also had to show that the money transferred to the defendants came from the corporations rather than from Douglas himself--for remember that the receiver is suing to recover corporate assets. The evidence on which the district judge relied consisted mainly of the criminal indictment against Douglas, his guilty plea and plea agreement, his deposition taken in the SEC's suit out of which the receivership arose, and the affidavit of an accountant who studied the books of the corporations and of Douglas himself.
 
 
 36
 The defendants point out that the indictment was inadmissible (an indictment is not evidence of the charges contained in it, any more than a complaint is), that the deposition was unsigned and contradicted by subsequent affidavits of Douglas, and that the accountant's affidavit was not notarized and (they argue) not based on the accountant's personal knowledge. But so what? Irregularities in evidence are material only when material facts are disputable and disputed; otherwise they are harmless error and can be ignored. New England Anti-Vivisection Society v. United States Surgical Corp., 889 F.2d 1198, 1204 (1st Cir.1989); Carter v. Western Reserve Psychiatric Habilitation Center, 767 F.2d 270, 273 n. 2 (6th Cir.1985). It is indisputable that when Douglas emerged from prison, where he had been serving a term for a previous fraud, in 1987, he had a negative net worth and that within a few months of modest lawful employment had launched his Ponzi scheme, to which his entire energies were devoted until its collapse; it was during this period that all the transfers to the defendants were made. Douglas's income during this period consisted almost entirely of money that he either withdrew from the corporations or earned on the money withdrawn. The corporations' money consisted either of money obtained from the fraudulent sale of limited partnerships or earnings on that money, and obviously any diversion of these fraudulently obtained assets to Douglas was improper. Any income that he obtained from these assets likewise belonged to the corporation from which he had wrongfully withdrawn them. The thief is not entitled to the interest or profits on the principal that he steals.
 
 
 37
 Although Douglas claims to have had some legitimate income, he has failed to specify source or amount, and we can safely assume that it was de minimis, that virtually all the money for the transfers came either directly or indirectly from assets that belonged to the corporation; and the transfers defrauded creditors consisting of the purchasers of the limited-partnership interests, who were tort creditors of the corporations. The fact that they did not know yet that they had been victimized did not detract from their status as tort creditors. Eby v. Ashley, 1 F.2d 971, 973 (4th Cir.1924); Rosenberg v. Collins, 624 F.2d 659, 664-65 (5th Cir.1980); In re Independent Clearing House Co., supra, 77 B.R. at 857. These claims of which the holders were not yet conscious made the corporations insolvent from the beginning. And, as we have seen, the transfers were not supported by adequate consideration.
 
 
 38
 Taken together, the facts just recited, most of which come right out of Douglas's plea agreement, which was admissible though hearsay, Fed.R.Evid. 803(22), and of which the district court properly took judicial notice under Fed.R.Evid. 201, see Green v. Warden, 699 F.2d 364, 369 (7th Cir.1983); Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236 (4th Cir.1989); Veg-Mix, Inc. v. U.S. Dept. of Agriculture, 832 F.2d 601, 607 (D.C.Cir.1987), established the defendants' liability (with the partial exception of the ex-wife). It is true that in affidavits submitted to the district court Douglas tried to backpedal from the admissions in his plea agreement. But just as an affidavit in which a witness tries to retract admissions that he made earlier in his deposition is normally given no weight in a summary judgment proceeding, Russell v. Acme-Evans Co., 51 F.3d 64, 67 (7th Cir.1995), so a witness should not be permitted by a subsequent affidavit to retract admissions in a plea agreement. Local 167 of Int'l Brotherhood of Teamsters v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804 (1934); Hardin v. Aetna Casualty & Surety Co., 384 F.2d 718, 719 (5th Cir.1967) (per curiam). Admissions--in a guilty plea, Country Mutual Ins. Co. v. Duncan, 794 F.2d 1211, 1215 (7th Cir.1986), as elsewhere--are admissions; they bind a party; and the veracity safeguards surrounding a plea agreement that is accepted as the basis for a guilty plea and resulting conviction actually exceed those surrounding a deposition.
 
 
 39
 The only other issue in these appeals is whether the judgments should be reversed because the district judge received in the course of the proceedings a number of letters, which he described as "very sad," from investors in the Ponzi scheme. These letters had no bearing on the legal issues, and there is no indication that the district judge was swayed by them. Judges are not sequestered, and do not have to recuse themselves because someone not a party, but interested financially or otherwise in a litigation, writes something about the case which the judge reads. United States v. Hillsberg, 812 F.2d 328, 335 (7th Cir.1987); United States v. Burger, 964 F.2d 1065, 1069-70 (10th Cir.1992); State v. Bromwich, 213 Neb. 827, 331 N.W.2d 537, 541 (1983); cf. In re Larson, 43 F.3d 410 (8th Cir.1994). At some point receipt of unauthorized communications about a case might so affect the impartiality of the judge or the appearance of impartiality that he would have to recuse himself. United States v. Sciuto, 531 F.2d 842, 846 (7th Cir.1976). But that point is far from having been reached here.
 
 
 40
 The judgment of the district court is affirmed except for the summary judgment in the suit against the ex-wife and her husband, as to which further proceedings on remand are necessary.
 
 
 41
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.